[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff has appealed from the assessment of damages made by the defendant for the taking of a portion of her property in South Windsor as shown on a map entitled: "TOWN OF SOUTH WINDSOR MAP SHOWING LAND ACQUIRED FROM EVELYN F. JOHNSON BY THE STATE OF CONNECTICUT INTERSTATE ROUTE 291 (LIMITED ACCESS HIGHWAY) SCALE 1" = 40' MAY 1 1990 ROBERT W. GUBALA TRANSPORTATION CHIEF ENGINEER — BUREAU OF HIGHWAYS." A copy of the map was introduced into evidence by agreement and marked Exhibit D. The portion of the property which was taken was described in Schedule A attached to the complaint.
The parties stipulated that the date of the partial taking was May 16, 1991, that damages were assessed by the defendant in the amount of $181,000, and that said amount was deposited with the Clerk of the Superior Court and has been withdrawn by the plaintiff. The parties also agreed that the following items might be received into evidence and marked as indicated:
 Exhibit A — Appraisal report of Amadon Associates, limited to Parcel A in the report;
Exhibit B — Map before taking;
Exhibit C — Map after taking;
Exhibit E — Contour model
The subject property consists of 9.524 acres, more or less, of relatively level undeveloped land in the southwesterly section of South Windsor lying on the south side of Chapel Road. A narrow strip of land, together with a slope easement along Chapel Road and drainage right of way 25 feet wide along the westerly property line were taken on February 10, 1989, in connection with the reconstruction of Chapel Road. At the southeast corner of the property there is a thirty foot right of way giving access to Burnham Street. The Town of East Hartford lies to the south of Burnham Street which is itself in East Hartford. The Towns of South Windsor and East Hartford border on the Town of Manchester a short distance to the southeast of the subject property. Land uses in the area are mostly residential. There is a residential development zoned for 20,000 square foot lots across Chapel Road from the subject property and there is a residential development in East Hartford on the other side of Burnham Street. Land along Burnham Street in South Windsor is zoned industrial. The frontage of the subject property along Chapel Road is zoned Rural Residential to a depth of about 200 feet. The CT Page 4508 rear portion of the property is zoned Industrial. Frontage on Chapel Road is approximately 638 feet. The property is mostly rectangular in shape and slopes gently down from Chapel Road. It is encumbered by a 25 foot drainage right of way along the westerly property line and an easement to slope along Chapel Road. It has a sizeable amount of wetlands towards the rear portion, the wetlands being mostly in the Industrial zone. The subject property has access to all utilities. Approximately 3.501 acres lie in the Rural Residential zone and approximately 6.023 acres in the Industrial zone. South Windsor has a well-developed industrial base as well as desirable residential development areas. Major north-south and east-west highways run through the town. When it has been completed, Interstate route 291 will connect Interstate route 91 with Interstate route 84. Permitted uses in Rural Residential zones are principally for one-family dwellings and agricultural uses. Minimum lot area permitted is 40,000 square feet with minimum width of 175 feet, minimum depth of 200 feet, minimum front and rear yards of 50 feet and minimum side yard of 20 feet. Manufacturing, processing, packaging and assembling of products are permitted uses in an Industrial zone, as well as office buildings, warehouses and other normal industrial uses. Minimum lot size permitted in an Industrial zone is 20,000 square feet with minimum width of 100 feet, minimum depth of 150 feet, minimum front yard of 35 feet, minimum rear yard of 25 feet and minimum side yard of 10 feet. Zoning regulations require a 50 foot buffer on each side of zone lines. Wetlands regulations require a setback of 40 feet for buildings and parking areas and a setback of 20 feet for grading activities.
The property taken is 5.766 acres, more or less, in area. It is the southerly portion of the subject property and comprises almost all of the industrial portion of the property together with a small part of the residential portion. The defendant also acquired the right of way to Burnham Street and a permanent easement to pond within an area of 0.145 of an acre lying on the northerly side of the taking line and for the most part in the remaining portion in the Industrial zone. Of the 5.766 acres, more or less, which was taken, approximately 5.6 acres was in the Industrial zone and approximately 0.2 acres was in the Rural Residential zone.
Glenn Chalder, a real estate development planner associated with Amadon Associates, testified for the plaintiff. It was his opinion that the portion of the subject property in the Industrial zone could have been CT Page 4509 used as a site for an industrial development before the take. He opined that an industrial building of approximately 26,500 square feet could have been placed on the 6.023 acres, more or less, zoned industrial. The right of way to Burnham Street provided access in his opinion, and he testified that a curb cut permit could be obtained administratively from the Town of East Hartford. He suggested that it was likely that a frontage variance could have been obtained or that, in the absence of a variance, a corridor to Chapel Road could have been used to provide necessary frontage. Exhibit B showed the location he proposed for such an industrial building. The building was located to meet setback and wetlands requirements, but Chalder used construction drawings rather than the South Windsor inland wetlands map for the location of the wetlands. The proposed building did not meet setback requirements for the wetlands as shown on the inland wetlands map. Chalder opined that before the take the development potential of the Rural Residential portion of the subject property was for three residential lots fronting on Chapel Road. If the construction drawings correctly depicted the wetlands, it would be necessary to obtain a permit to cross the wetlands to reach the easterly lot.
Harold Law, Jr., the owner and operator of a farm and a builder and designer was called as a witness by the plaintiff. He has bought and subdivided raw land and built houses for sale. He has also sold subdivisions and has designed houses to sell in the $200,000 range in his Granby subdivision. He opined that the size of a lot does not determine selling price by itself and that it is important to determine what will sell in a given area. He examined the site after the take and concluded that if he were to develop the site he would have to compete with the houses on the northerly side of Chapel Road on 20,000 square foot lots. He opined that he could build such a house for $170,000 including builder's profit, overhead, and realtor's commission, but excluding the cost of the land. Law testified that considering the location of Interstate route 291, he would struggle to sell such a house for $200,000, and that he would be hard pressed to pay more than $25,000 for each of the three lots which had been proposed.
Dean C. Amadon, a qualified real estate appraiser, was called as an expert witness by the plaintiff. Amadon opined that the highest and best use for the subject property before the take was as it was zoned. He relied upon Chalder to determine what was possible and CT Page 4510 permissible. He used the direct sales comparison approach to value, but he used no split zone sales. He identified eight sales of industrial land on which an industrial building was approved and, in seven cases, had been built. He opined that where site constraints such as configuration and wetlands limit development yield, price per square foot of building is a more accurate indicator of value than price per acre. He made moderate adjustments in those cases where approval for development had already been obtained. He also adjusted downward where comparables included a residence or residential lot or where buyers had assumed assessments or liens. He adjusted for time, location, physical and developmental characteristics. After adjustments, he concluded that the industrial portion of the property had a value of $8.00 per square foot of building. Assuming that a 26,500 square foot building was permissible and possible before the take, he estimated the value of the land in the Industrial zone at $204,800. Amadon also used the direct sales comparison approach to value in estimating the value of the portion of the property in the Rural Residential zone. He looked at it as a subdivision rather than as raw land. He identified eight sales of residential lots which he considered comparable. He opined that the highest and best use of this portion of the subject property was for development into three lots. Seven of the comparable sales occurred in residential subdivisions. Adjustments were made for financing, relationship between buyer and seller, location, size and other physical characteristics. After adjustments Amadon concluded that the value of each residential lot was approximately $73,000. He reduced that value for the west lot by about 10% for the drainage right of way and for the middle lot by about 5% for wetlands influence. Even though the east lot was influenced by wetlands, Amadon enhanced its value by about 15% because of its size. His estimate of value for the three lots as thus adjusted was $219,000. He reduced this for costs of development by $22,000, leaving a net estimate of value of $197,000. Amadon opined that after the take the highest and best use continued to be for development into three residential lots. He reduced the value of the west lot and the middle lot by about 10% because of the ponding easement at the rear of the lots. He reduced the value of the east lot by about 20% because of its reduction in depth and area. Amadon also opined that the proximity of the highway and the access ramp would have a major impact, at least in the absence of a noise barrier. He reported that there is no known data to distinguish between the impact of adjacent industrial development as opposed to an adjacent interstate highway and was unable to estimate the negative impact without such CT Page 4511 data. He estimated the value of the three lots with these deductions to be $188,000. He reduced this value for costs of development by $19,000, leaving a net estimate of value after the taking of $169,000. Amadon estimated damages at $204,800 for the taking of the southerly portion of the subject property, comprising almost all of the industrial portion of the property. He estimated severance damages to the northerly portion of the property at $28,000. His total estimate of damages was thus $232,800.
Brian C. Marchi, a qualified real estate appraiser, testified for the defendant. It was his opinion that the highest and best use for the subject properly before the taking was in accordance with its zoning. Because the land was unimproved and there had been no applications for subdivision or development, Marchi valued the land as raw acreage and opined that the only applicable approach to value was the direct sales comparison approach. He found one sale of land with an identical split zone and similar wetlands about one-half mile from the subject property. He found two sales of land in an Industrial zone which he also identified as comparable sales. Marchi opined that it was unlikely that access to the industrial land would be allowed from Chapel Road and that access would have to be from Burnham Street. He also opined that because the industrial land possessed no frontage, a frontage variance would be required for development. He further opined that 50% of the industrial land appeared to be within the town designated inland wetlands area and that some of the industrial land was virtually inaccessible. Marchi made adjustments to the sales he identified as comparable for frontage, size and shape, developability and zone. He concluded that the subject property before the taking had a fair market value of $32,000 per acre or a total value of $308,000.
The taking comprised almost all of the industrial land and a small portion of the residential land. After the take, there was no industrial development potential and the highest and best use for the remaining portion of the subject parcel was for residential development. Marchi opined that the easement for ponding would have no effect on developability because it will exist mostly on a remnant of industrial land and might be left as open space. He used the direct sales comparison approach to value after the take and used residential acreage sales which he identified as comparable. He adjusted for frontage, size and shape, developability and location, making a negative adjustment for the adverse effect of the highway ramp system. He concluded that the fair market value of the CT Page 4512 subject property after the take was $33,000 per acre, or a total of $127,000. He thus estimated damages at $181,000.
No attempts have ever been made to obtain any of the approvals and permits which would have to be obtained from zoning and inland wetlands authorities and other town officials in order to develop any portion of the subject premises. In light of other development in the general area, it seems reasonably likely that attempts to develop the subject property would have occurred in the forseeable future, assuming favorable economic circumstances. The likelihood of approvals for the portion zoned for residential uses was and is very high. It would have been much more difficult to obtain all the necessary permits and approvals for development of the industrial zone because of the extensive wetlands, the lack of frontage and limited access. The highest and best use for the subject property before the take nevertheless was for use in accordance with zoning.
After the take, the potential for industrial development had disappeared. The small portion of land zoned for industrial use which remained was of use only as rear land added to the land zoned for residential uses. The easement for ponding in the rear of any proposed residential development will detract somewhat from the value of the property, as will the proximity of the highway and the ramp.
After viewing the property and after having given due consideration to the testimony of all of the witnesses and to all of the evidence, and to my own knowledge of the elements establishing value, I conclude that the damages sustained by the plaintiff are $200,000. Judgment may enter for the plaintiff to recover the sum of $19,000 in addition to the $181,000 already paid, with interest on said further sum from the date of taking to the date of payment, together with costs and an allowance of $1,500 towards her appraisal fees.
GEORGE D. STOUGHTON STATE TRIAL REFEREE